United States District Court

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RICHARD SMITH and REBECCA KLEIN, on
behalf of themselves and all others similarly
situated,

        Plaintiffs,

  v.

FORD MOTOR COMPANY, and DOES 1-
100, inclusive,

        Defendants.
_____/

No. C-06-00497 MMC

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

      Before the Court are defendant Ford Motor Company's ("Ford") Motion for Summary
Judgment as to Plaintiff Richard Smith ("Smith"), and Motion for Summary Judgment as to
Plaintiff Rebecca Klein ("Klein"), each filed November 17, 2008.  Plaintiffs have filed a joint
opposition to both motions, to which Ford has replied.  Having read and considered the
papers filed in support of and in opposition to the motions, the Court hereby rules as
follows.[1]

## PROCEDURAL AND FACTUAL BACKGROUND[2]

      On January 25, 2006 plaintiffs filed the instant action.  On September 22, 2006,

_____

     [1] By prior order, the previously scheduled hearing on the motions was vacated.

     [2] The following facts are either undisputed or read in the light most favorable to
plaintiffs.

1   plaintiffs filed their Third Amended Complaint ("TAC"), in which plaintiffs allege that Ford

2   unlawfully concealed information concerning the failure rate of the ignition locks in its 2000

3   through 2006 model year Focus vehicles, provided an unconscionable standard warranty,

4   and maintained a secret warranty adjustment program.

5          An ignition lock is the vehicle part in which the key is inserted and turned to activate

6   the ignition; its purpose is to start the car.  When an ignition lock fails, the driver is

7   prevented from turning the key.  (See Declaration of Dina E. Micheletti ("Micheletti Decl.")

8   Ex. 7 at 31132-33.)  According to Ford's internal engineering specifications, its ignition

9   locks are designed to function for at least 80,000 cycles without maintenance.[3]  (See

10  Declaration of Jeffrey L Fazio ("Fazio Decl.") Ex. C at SNYF 000489; see also Micheletti

11  Decl. Ex. A (Deposition of Gerald P. Bonnici ("Bonnici Dep.") at 261:17-23.)  Thus, by

12  plaintiffs' calculation "[i]f owners start their Focus 10 times per day, every day, for as long

13  as they own their vehicle, the ignition lock would be cycled 3,650 times a year, thereby

14  taking more than 20 years for an ignition lock to reach 80,000 cycles."  (See Pls.' Opp'n at

15  3:19-4:1.)

16         In the instant litigation, plaintiffs contend the ignition locks in the subject Focus

17  vehicles suffered from two separate but related defects, which plaintiffs characterize as the

18  "ergonomic defect" and the "mechanical defect" (collectively, the "ignition-lock defect").

19  (See Pls.' Opp'n at 5:3-6:2.)  As described in a January 21, 2005 email written by Gerald P.

20  Bonnici ("Bonnici"), Ford's "engineer with responsibility for ignition locks in all Ford North

21  American vehicles" (see Def.'s Reply at 5:4-5), because of the manner in which the ignition

22  lock is attached to the steering column, the "angle [in which] you put your key in [and] out of

23  [the] ignition lock is very awkward," requiring "you to bend your wrist back to an

24  'uncomfortable' position – nearly horizontal instead of the normal 10:00 - 11:00 position"

25  (the "ergonomic defect"). (See Micheletti Decl. Ex. 7 at SNYF 031132-33.) As Bonnici

26  further explains:

27  _____

28         [3] According to Ford's ignition lock durability test procedures "[o]ne cycle will consist
    of key insertion, rotation, and key removal."  (See Fazio Decl. Ex. C at SNY000490.)

                                                  2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

[W]hen you shut off your car, you start rotating back [and] pulling on the key in the "normal" key out position.  But because this design requires extra rotation from that "normal" position, customers end up pulling the key out against the tumblers before the lock is ready to release the key.  Repeated occurrences of this bend the tumblers[.]  [F]inally, bent tumblers prevent [the] lock from turning.

(See id.)  According to Bonnici, the ignition lock's tumblers' susceptibility to bending presented a "durability issue" (the "mechanical defect").  (See id. Ex. 19 at SNYF 00031212, Ex. 23 at SNYF 00021200.)

The Focus was introduced in the United States in 1999 as a 2000 model year vehicle.  (See Declaration of Gerald P. Bonnici ("Bonnici Decl.") ¶ 14.)  In a June, 1999 document, authored prior to the "launch" of the Ford Focus in the United States, Ford engineers reported that inserting the key into the ignition required "high effort."  (See Micheletti Decl. Ex. 54 at SNYF-00022037.)  The 1999 launch of the Focus was "followed by a relatively large number of warranty repairs related to the ignition lock on the 2000 model year Ford Focus and the 2001 model year Focuses built before October 2000," described as the "ignition-lock launch spike."  (See Bonnici Decl. ¶¶ 15-16.)  As of July 31, 2000, ignition locks installed in the 2000 Focus had failed at a rate of 53.89 R/1000 (or 5.4 percent), which Ford characterized as a rate "significantly worse than other car lines."  (See Fazio Decl. Ex. I at SNYF-0002709).

Following the launch spike, in order to counter the high warranty repair rates, Ford and its ignition lock manufacturer made manufacturing and design changes to the subject ignition locks (see Bonnici Decl. ¶¶ 16, 18), which resulted in a substantial decrease in the warranty repair rates (see id. ¶ 17).[4]  Specifically, from a warranty repair rate of 24.3 percent for its 2000 model year Focus vehicles, Ford saw the rate drop to 6.9% for its 2001 model year vehicles, then drop again to 3.1% for its 2002 model year vehicles, before rising to 12% for its 2003 model year vehicles.  (See Micheletti Decl. Ex. 2.)

Additionally, during the relevant period, Ford operated an "After-Warranty

---

[4] The above-referenced manufacturing and design changes were made to ignition locks installed on new Ford Focus vehicles and also to replacement ignition locks for use in warranty repairs and after-market retail sales.  (See Bonnici Decl. ¶ 19.)

3

Assistance" ("AWA") program, which is described by Ford as "payments made on a case-by-case basis for repairs not covered by the vehicle warranty, service parts warranty or any Ford [Extended Service Plan], or any non-Ford service contract or aftermarket additive service warranty."  (See Declaration of Joseph C. Bradley ("Bradley Decl.") Ex. 3 at 2.)  The AWA program covered repairs where a Ford vehicle was "not performing to customer expectations and there [was] an opportunity for increased customer satisfaction and owner loyalty."  (See Bradley Decl. Ex. 3 at 6.)  Ford's AWA manual provided a number of questions for dealers to consider when making a decision to offer AWA to a customer. (See Bradley Decl. Ex. 3 at 6-7.)  Pursuant to the AWA program, Ford replaced 16,227 Focus ignition locks on its model year 2000 through 2006 Ford Focus vehicles, 9655 of which were repaired for 2000 model year Focus vehicles.  (See Micheletti Decl. Ex. 2 at 2.)[5]

Smith purchased a new 2003 model year Ford Focus from a Ford dealership on October 11, 2003.  (See Deposition of Richard Smith ("Smith Dep.") Ex. 2.)  Smith also purchased Ford's standard New Vehicle Limited Warranty, under which Ford agreed that "authorized Ford Motor Company dealers [would] repair, replace, or adjust all parts on [Smith's] vehicle that [were] defective in factory-supplied materials or workmanship" for "three years or 36,000 miles."  (See Smith Dep. 20:18-22; see also Bradley Decl. ¶ 5, Ex. 1 at 5-6).  In November 2005, after Smith had driven his Focus 56,705 miles, Smith's ignition lock failed, preventing him from starting his vehicle.  (See Smith Dep. Ex. 1 at 89-90). Smith paid $521 to have his ignition lock replaced at a Ford dealership.  (See id.)

Klein purchased a used 2003 model year Ford Focus from Honda of Oakland in May

---

[5]  Plaintiffs also endeavor to show the percentage of after-warranty replacement locks sold to Focus owners relative to the total population of Focus vehicles.  In particular, plaintiffs submit a figure for the total number of 2000 through 2006 model year Focus vehicles sold to Ford dealers (see Micheletti Decl. Ex. 30) as compared with after-warranty sales figures for ignition locks of the type used in the Ford Focus during the period from 2002 to 2008.  (See id. Ex. 31; see also Fazio Decl. Exs. J, K.)  As Ford points out, however, because Ford's Escape model vehicles use the same ignition locks as Ford's Focus model vehicles (see Micheletti Decl. Exs. 23, 41), it is not possible, on the evidence available, to determine the number of after-warranty replacement ignition locks that were sold to Focus owners, nor is it possible to compare such sales to the population of Focus vehicles.

2004 (<u>see</u> Deposition of Rebecca Klein ("Klein Dep.") Ex. 4) after it previously had been driven for 37,274 miles as a rental car (<u>see</u> Klein Dep. 81:22-82:20).  Klein bought the vehicle "as-is," with no warranty.  (<u>See</u> Klein Dep. 55:1-24, 66:4-13, Exs. 3, 4.)  In December 2005, the ignition lock failed and Klein was unable to start her vehicle.  (<u>See</u> Klein Dep. 47:17-48:5.)  A locksmith replaced the ignition lock for $232.  (<u>See</u> Klein Dep. 47:5-48:5, Ex. 3 at 6.)  In September 2006, Klein's ignition lock again failed, and she replaced it for $244.  (<u>See</u> Klein Dep. 45:9-46:2, Ex. 3 at 1.)

In their TAC Plaintiffs assert state law claims against Ford for (1) Declaratory Relief; (2) Fraudulent Concealment/Nondisclosure; (3) Unjust Enrichment; (4) Unfair and Deceptive Acts and Practices in Violation of the Consumers Legal Remedies Act California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 et. seq.; and (5) Unfair, Fraudulent, and Unlawful Practices under the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code sections 17200-17209.  (<u>See</u> TAC ¶¶ 79-107.)[6]  Ford moves for summary judgment as to each of plaintiffs' claims.

## LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that a court may grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  <u>See</u> Fed. R. Civ. P. 56(c).

The Supreme Court's 1986 "trilogy" of <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986), <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986), and <u>Matsushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986), requires that a party seeking summary judgment show the absence of a genuine issue of material fact.  Once the moving party has done so, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  <u>See</u> <u>Celotex</u>, 477 U.S. at 324 (internal

---

[6] Plaintiffs' UCL claim is predicated in part on California's Secret Warranty Law, Cal. Civ. Code § 1795.90-1795.93.

1  quotation and citation omitted).  "When the moving party has carried its burden under Rule

2  56(c), its opponent must do more than simply show that there is some metaphysical doubt

3  as to the material facts."  Matsushita, 475 U.S. at 586.  "If the [opposing party's] evidence is

4  merely colorable, or is not significantly probative, summary judgment may be granted."

5  Liberty Lobby, 477 U.S. at 249-50 (citations omitted).  "[I]nferences to be drawn from the

6  underlying facts," however, "must be viewed in the light most favorable to the party

7  opposing the motion."  See Matsushita, 475 U.S. at 587 (internal quotation and citation

8  omitted).

9  **DISCUSSION**

10  In its motions for summary judgment Ford argues (1) it had no duty to disclose the

11  risk that the subject ignition locks would fail; (2) it's standard three-year, 36,000 mile

12  warranty is not unconscionable, and (3) Ford did not violate the Secret Warranty Law by

13  not publicizing its AWA program.  Additionally, Ford argues Klein lacks standing to bring a

14  CLRA claim, lacks evidence that she suffered any loss as a result of any failure to disclose,

15  and the restitution Klein seeks on her UCL claim constitutes a non-recoverable claim for

16  damages.[7]

17  **A.  CLRA**

18  **1.  Duty to Disclose Risk of Ignition Lock Failure**

19  Plaintiffs' claim under the CRLA is based in part on Ford's not having disclosed the

20  risk that ignition locks in its Focus vehicles would fail.[8]  (See TAC ¶ 98 (citing Cal. Civ.

21  Code § 1770(a)(5), (a)(7)).)

22  "The CLRA proscribes specified "unfair methods of competition and unfair or

23  deceptive acts or practices' in transactions for the sale or lease of goods to consumers."

24

25  _____

26  [7] In some instances, in lieu of reiterating its position in each motion, Ford has
incorporated its arguments by reference.  (See Def.'s Mot. (Smith) at 2 n.1; Def's Mot.
(Klein) at 9:2-3.)

27  [8] As discussed below, plaintiffs' CLRA claim is also based on an allegation that Ford

28  "limit[ed] the warranties applicable to Focus ignition locks in an unconscionable manner."
(See TAC ¶ 99 (citing Cal. Civ. Code § 1770(a)(19)).)

1   Daugherty v. American Honda Motor Co., 144 Cal.App.4th 824, 833 (2006) (quoting Cal.

2   Civ. Code § 1770(a)).  Such acts and practices include "[r]epresenting that goods . . . have

3   characteristics . . . which they do not have," Cal. Civ. Code § 1770(a)(5), and [r]epresenting

4   that goods . . . are of a particular standard, quality, or grade, . . . if they are of another," id.

5   § 1170(a)(7).

6        Here, as noted, plaintiffs allege Ford failed to disclose, and was under an obligation

7   to disclose, the risk that the subject ignition locks would fail after the expiration of the

8   warranty period. The California Court of Appeal has held that a manufacturer cannot be

9   found liable under the CLRA for failure to disclose a defect that manifests itself after

10  expiration of the warranty period unless such omission (1) is "contrary to a representation

11  actually made by the defendant" or (2) pertains to a "fact the defendant was obligated to

12  disclose."  See Daugherty, 144 Cal.App.4th at 835-36.

13       Under California law, there are four circumstances in which an obligation to disclose

14  may arise :

15           (1) when the defendant is in a fiduciary relationship with the plaintiff;
             (2) when the defendant had exclusive knowledge of material facts not
16           known to the plaintiff; (3) when the defendant actively conceals a material
             fact from the plaintiff; and (4) when the defendant makes partial
17           representations but also suppresses some material facts.

18  See Limandri v. Judkins, 52 Cal.App.4th 326, 337 (1997).  As plaintiffs do not allege the

19  existence of a fiduciary relationship or that Ford made any representations about its ignition

20  locks, only the second and third of the above-referenced circumstances are implicated

21  here, and, as set forth above, both require a finding of "materiality."  See, e.g., Ostreicher v.

22  Alienware Corp., 544 F. Supp. 2d 964, 970-71 (N.D. Cal. 2008), (holding "[t]he first

23  condition is not at issue here . . . [a]ll of the other situations require materiality"), aff'd

24  Ostreicher v. Alienware Corp., 322 Fed.Appx. 489 (9th Cir. 2009).

25       Further, where, as here, a plaintiff's claim is predicated on a manufacturer's failure to

26  inform its customers of a product's likelihood of failing outside the warranty period, the risk

27  posed by such asserted defect cannot be "merely" the cost of the product's repair, see

28  Daugherty, 144 Cal.App.4th at 836; rather, for the omission to be material, the failure must

7

1   pose "safety concerns," see id. at 835-838.  In other words, under California law, and as

2   recently described by the Ninth Circuit: "A manufacturer's duty to consumers is limited to its

3   warranty obligations absent either an affirmative misrepresentation or a safety issue."  See

4   Oestriecher v. Alienware Corp., 322 Fed.Appx. at 493 (affirming dismissal of CLRA, UCL

5   and fraudulent concealment claims where plaintiff failed to allege defendant had

6   "affirmatively misrepresented its products" or that the alleged defect "posed a threat to his

7   own safety or the safety of others").

8          Such rule is consistent with the policies underlying California warranty law.  As noted

9   in Daugherty:

10              '[V]irtually all product failures discovered in automobiles after expiration of
            the warranty can be attributed to a 'latent defect' that existed at the time of
11              sale or during the term of the warranty.  All parts will wear out sooner or
            later and thus have a limited effective life.  Manufacturers always have
12              knowledge regarding the effective life of particular parts and the likelihood
            of their failing within a particular period of time . . . . [M]anufacturers . . .
13              can always be said to 'know' that many parts will fail after the warranty
            period has expired.  A rule that would make failure of a part actionable
14              based on such 'knowledge' would render meaningless time/mileage
            limitations on warranty coverage.'
15

16   See Daugherty, 144 Cal.App.4th at 830-31 (alterations in original) (quoting Abraham v.

17   Volkswagen of America, Inc., 795 F.2d 238, 250 (2d Cir. 1986)).  Indeed, as noted by the

18   district court in Oestreicher, "the purpose of a warranty is to contractually mark the point in

19   time during the useful life of a product when the risk of paying for repairs shifts from the

20   manufacturer to the consumer."  See Oestreicher, 544 F.Supp.2d at 972 (citing Abraham,

21   795 F.2d at 250).   Further, the rule set forth in Daugherty is consistent with the general

22   policy stated by the California Supreme Court that although "[a] consumer should not be

23   charged at the will of the manufacturer with bearing the risk of physical injury when he buys

24   a product on the market," the consumer nevertheless "can . . . be fairly charged with the

25   risk that the product will not match his economic expectations unless the manufacturer

26   agrees that it will."  See Seely v. White Motor Co., 63 Cal.2d 9, 18 (1965); see, e.g.,

27   Berenblat v. Apple Inc., 2009 WL 2591366, *5-7 (N.D. Cal. 2009) (dismissing claims based

28   on allegedly defective computer component; stating "[t]he failure to disclose a defect that

8

1  might, or might not, shorten the effective life span of [a product] that functions precisely as

2  warranted throughout the terms of the express warranty" is not actionable); Morgan v.

3  Harmonix Music Systems, Inc., 2009 WL 2031765, *4 (N.D. Cal. 2009) (dismissing claims

4  based on allegedly defective video game drum pedals; noting that "[a]ccording to all of the

5  relevant case law, defendants are only under a duty to disclose a known defect in a

6  consumer product when there are safety concerns associated with the product's use");

7  Wilson v. Hewlett Packard Co., 2009 WL 3021240, *1 (N.D. Cal. 2009) (dismissing CLRA

8  claim based on manufacturer's alleged duty to disclose omitted fact where safety concerns

9  not implicated); Hoey v. Sony Electronics, Inc., 515 F. Supp. 2d 1099, 1105 (N.D. Cal.

10 2007) (holding "[t]here is no authority that provides that the mere sale of a consumer

11 electronics product in California can create a duty to disclose any defect that may occur

12 during the useful life of the product").

13        Accordingly, because plaintiffs' CLRA claim is not based on any misrepresentation

14 made by Ford, but rather is based on an allegation that Ford had a duty to disclose the risk

15 its ignition locks would fail, plaintiffs' claim, absent evidence of a safety concern, cannot

16 succeed.  See Daugherty, 144 Cal.App.4th at 835-838.[9]

17        **2.  Safety Issue**

18        As a threshold matter, Ford argues the Court should follow the reasoning of

19 Iannacchino v. Ford Motor Co., 888 N.E. 2d 879, 888 (Mass. 2008), by finding Ford had no

20 duty to disclose the failure rate of its ignition locks unless plaintiffs have offered evidence

21 Ford violated a "legally required" safety standard.  In Iannacchino, the Massachusetts

22 Supreme Court held:

23        Where, as in this case, there is no allegation that the plaintiffs – or indeed
          anyone else – have suffered personal injury or property damage, the
24

25        [9]  Plaintiffs' reliance on cases assertedly holding to the contrary, see Falk v. General
26 Motors Corp., 496 F.Supp.2d 1088, 1096 (N.D. Cal. 2007); Chamberlan v. Ford Motor Co.,
   369 F.Supp.2d 1138, 1145 (N.D. Cal. 2005), is unavailing as the defects alleged in those
27 cases were found to raise safety concerns.  See Oestreicher, 544 F.Supp.2d at 971
   (distinguishing Falk; noting "safety consideration" presented by defective speedometer was
28 "integral" to district court's finding of materiality); Daugherty, 144 Cal.App.4th at 839 n.8
   (distinguishing Chamberlain as involving "dangerous manifold defect").

complaint must identify a legally required standard that vehicles were at least implicitly represented as meeting, but allegedly did not. When the standard that a product allegedly fails to meet is not one legally required by and enforced by the government, a claim of economic injury based on overpayment lacks the premise that the purchase price entitled the plaintiffs to a product that met that standard.

See Iannachino 888 N.E. 2d at 888.

As the relevant "legally required" standard, Ford points to the National Highway Traffic Safety Act ("Safety Act"), 49 U.S.C. § 3010, et seq. (See Def.'s Smith Mot. at 13:28-14:7.) In response, plaintiffs argue their CLRA claim is not dependent on a violation of the Safety Act because the rule expressed in Iannacchino does not reflect California law and because, unlike in Iannacchino, the plaintiffs here have suffered property damage. (See Pls.' Opp'n at 30:9-31:4.)

The Court declines to follow Iannacchino. Ford cites to no case authority, and the Court is aware of none, in which a court, applying California law in deciding whether to impose a duty to disclose a safety-related defect, has required a plaintiff to offer evidence of a violation of a standard legally required by and enforced by the government. See, e.g., Ostreicher I, 544 F. Supp. 2d at 971 (striking plaintiff's CLRA claim without reference to safety standard); see also Daugherty, 144 Cal. App. 4th at 836 (finding, without reference to Safety Act or other safety standard, "complaint [was] devoid of factual allegations showing any instance of physical injury or any safety concerns").

Accordingly, the Court finds Smith and Klein may demonstrate a duty to disclose without showing the alleged ignition-lock defect violates a standard legally required by and enforced by the government under the Safety Act or other statute or regulation. The Court does, however, find the standards set forth under the Safety Act to be relevant to a determination of whether an alleged defect in an automotive part presents a safety concern.[10]

Here, plaintiffs argue, the subject ignition locks present "safety/security risks"

---

[10] Indeed, plaintiffs agree the Safety Act "is among the legal standards against which ignition-lock failure may be measured." (See Pls.' Opp'n at 31:4-6.)

1    because such locks can (1) prevent drivers from starting their vehicles, and (2) prevent

2    drivers from shutting off their vehicles' engines.  (See Pls.' Opp'n at 29:17-19.)

3                              **a.  Inability to Start Vehicle**

4         Ford argues "there are no reports that anyone has ever been injured" by the failure

5    of an ignition lock, and that the dangers described by plaintiffs are too speculative to

6    amount to a safety issue giving rise to a duty of disclosure.  (See Def.'s Mot. (Smith) at

7    14:13-25.)  Ford further argues, by reference to the Safety Act, that "motor vehicle safety"

8    does not include "any conceivable safety hazard, no matter how insignificant" (see id. at

9    14:26-15:4) (citing United States v. General Motors Corp., 656 F. Supp. 1555, 1579 (D.D.C.

10   1987)), but, rather, means "the performance of motor vehicles in such a manner that the

11   public is protected against unreasonable risk of accidents" (see id. at 14:27-15:1) (citing 49

12   U.S.C. § 30102(a)(8)) (internal quotation omitted).[11]  Additionally, Ford argues, the National

13   Highway Transportation Safety Authority ("NHTSA"), which sets and enforces safety

14   performance standards for motor vehicles and motor vehicle equipment, has denied

15   petitions for defect investigations where the alleged defect theoretically could create a

16   safety problem but the risk is small, and, in particular, "has consistently denied defect

17   petitions under circumstances where the risk not being able to start the vehicle was

18   accompanied by other, even more serious risks."  (See id. at 15) (citing NHTSA denials of

19   defect petitions).[12]

20        In response, plaintiffs argue that "being unexpectedly stranded" raises safety

21

22        [11]  As defined in 49 U.S.C. § 30102, "'motor vehicle safety' means the performance
     of a motor vehicle or motor vehicle equipment in a way that protects the public against
23   unreasonable risk of accidents occurring because of the design, construction, or
     performance of a motor vehicle, and against unreasonable risk of death or injury in an
24   accident, and includes nonoperational safety of a motor vehicle."  49 U.S.C. § 30102(a)(8).

25        [12]  See Denial of Petition, NHTSA notice, 71 Fed. Reg. 14988 (Mar. 24, 2006)
     (denying petition where, inter alia, "shifter could not be shifted out of the 'Park' position";
26   stating "petitioner has not provided any evidence of a safety-related defect"); Denial of
     Petition, NHTSA notice, 67 Fed. Reg. 61375 (Sept. 30, 2002) (denying petition where,
27   malfunction reportedly caused, inter alia, "no start"; stating "the . . . defect alleged in the
     petition does not appear to be related to motor vehicle safety within the meaning of our
28   statute"); Denial of Petition, NHTSA notice, 66 Fed. Reg. 55243 (Nov. 1, 2001) (denying
     petition where, inter alia, reported defect "caus[ed] engine to stall or fail to start").

1   concerns sufficient to require disclosure.  Plaintiffs point, for example, to a complaint by a

2   diabetic who reported that when her ignition lock failed, preventing her from starting the

3   vehicle, she was "not able to get to her medicine." (See Fazio Decl. Ex. H at 27.)  Plaintiffs

4   also point to what appears to be an in-house document, titled "Launch & Brand Plan," in

5   which Ford listed its "battery saver technology" and "fail-safe coolant" under the heading

6   "safety/security." (See Fazio Decl. Ex. S at 45, 47.)  "Security" concerns, however, are

7   distinguishable from "safety" concerns and, in any event, a marketing plan for batteries is

8   not, contrary to plaintiffs' argument, a concession that the defect at issue herein requires

9   disclosure.  Lastly, relying on cases decided under the Safety Act, plaintiffs argue that a

10  part that fails in large numbers is more likely to pose a safety concern than a part that fails

11  only on isolated occasions.  (See Pls.' Opp'n at 31:7-10.)[13]   As defendants point out,

12  however, the cases on which plaintiffs rely concerned a "severe risk of injury while the

13  vehicle was in motion."  (See Def's Reply at 9:1-19); see, e.g., United States v. General

14  Motors Corp., 561 F.2d 923, 929 (D.C. Cir.1977 (dissenting opinion) (discussing "sudden

15  loss of steering" caused by defective steering system); United States v. General Motors

16  Corp., 518 F.2d 420, 438, (D.C. Cir. 1975) (discussing wheel failures).

17       Having considered the parties' respective evidentiary showings and the applicable

18  law, the Court agrees with Ford that the dangers envisioned by plaintiffs are speculative in

19  nature, deriving in each instance from the particular location at which the driver initially has

20  parked the vehicle and/or the driver's individual circumstances.  Plaintiffs offer no evidence

21  that the ignition-lock defect causes engines to shut off unexpectedly or causes individuals

22  to stop their vehicles under dangerous conditions.  Nor do plaintiffs offer any legal authority

23  for their argument that a failure to start a vehicle poses a safety concern requiring

24  disclosure.  Moreover, to impose such a duty based on risks of the nature cited by plaintiffs,

25

26       [13] Plaintiffs also offer evidence that in 1983 Alfa Romeo recalled its GTV6 and Spider
    models due to an electrical problem that "intermittent[ly]" prevented the vehicles from
27  starting.  (See Fazio Decl. ¶ 26, Ex. V (stating "inability to start and move the vehicle from
    the roadway could result in an accident").)  The reason for the recall, however, is not
28  reflected in the document submitted, nor is there any evidence that the recall was required
    under the Safety Act or otherwise.

1   would effectively require auto manufacturers to disclose the failure rate of every part that

2   potentially could immobilize a vehicle.  In the absence of authority to such effect, the Court

3   declines to do so.

4       Accordingly, the Court finds plaintiffs have not offered evidence sufficient to support

5   a finding that the failure to start resulting from the ignition-lock defect presents a risk to

6   safety such that the nondisclosure of such defect constitutes a material omission.

7                           **b.  Inability to Shut off Engine**

8       Plaintiffs also assert that the ignition-lock defect can prevent the engine from being

9   turned off.  Ford argues to the contrary.  In support thereof, Ford submits the affidavit of

10  Paul Taylor, Ph.D. ("Dr. Taylor"), an expert in the field of mechanical engineering who

11  specializes in the analysis and prevention of failures and accidents.  (See Affidavit of Paul

12  Taylor ("Taylor Aff.") ¶ 2.  Dr. Taylor describes his evaluation of the subject ignition locks

13  and concludes there are "two separate circumstances where [the subject ignition locks] do

14  not operate correctly . . . [and] neither of these conditions will result in a circumstance

15  where . . . the engine cannot be turned off."  (See id. ¶ 5.)[14]  As Dr. Taylor further explains,

16  the subject ignition-lock defect cannot result in an inability to turn off the engine because

17  the key cannot become stuck in the "Start" or "Run" positions. (See id. ¶¶ 6, 7, 9.)[15]

18  Plaintiffs offer no expert opinion to the contrary.[16]

19      Rather, plaintiffs offer records from Ford's AWS database and Ford's Customer

20  Quality Indicator System ("CQIS')  database, which records, plaintiffs argue, are evidence

21  _____

22  [14] Plaintiffs' objection to the above opinion under Rule 702 of the Federal Rules of
    Evidence and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 590-91 (1993) is hereby

23  overruled.  Contrary to plaintiff's objection, the Court finds Dr. Taylor's opinion to be the
    "product of reliable principles and methods."  See id.; (see also Taylor Aff. ¶¶ 5-9)

24  (describing procedure by which ignition lock components were placed in clear plastic
    housing and actions of components were observed when "dislodged and displaced to the

25  limit that geometry allows"; providing detailed diagrams and photographs).

26  [15] Further, Dr. Taylor reports, he searched the warranty records in Ford's AWS
    database, and "[i]n no instance was a warranty record found where the key was jammed" in

27  those positions (See id. ¶ 10.)

28  [16] Indeed, the TAC contains no allegation to the effect that the ignition-lock failure
    can result in an inability to shut off the engine.

1    that ignition-lock failures have prevented some Focus drivers from shutting off their

2    engines.  (See Fazio Decl. ¶ 3; Micheletti Decl. Exs. 25, 26.)  Ford objects that such

3    complaints are inadmissible hearsay.  (See Def.'s Reply at 8 n.4.)  The Court agrees.[17]

4    Plaintiffs make no argument, let alone submit evidence to lay a foundation to show, the

5    customers' complaints, comments by any mechanic, or any other remarks contained

6    therein qualify under any exception to the hearsay rule. Nor is any such exception apparent

7    from the documents themselves.  (See, e.g., Micheletti Decl. Ex. A (Bonnici Dep.) at

8    287:24-288:2) (testifying, in response to question as to source of entry in CQIS database:

9    "I have no idea where this recommendation came from."); id. at 304:4-305:22 (testifying in

10   response to question regarding AWS documents shown to him: "I've never seen data in this

11   format."; also testifying AWS database contains complaints irrespective of  whether

12   deemed  erroneous because "it's just all thrown in there").)

13        Even if the records were admissible, however, the undisputed evidence

14   demonstrates the vast majority of the reports clearly do not reflect an ignition-lock problem,

15   but, rather, an ignition-switch problem, i.e., an electrical problem, which is not the subject of

16   plaintiffs' complaint, and the remaining one or two are more consistent with an electrical

17   problem than an ignition-lock problem.  (See  Micheletti Decl. Ex. A (Bonnici Dep.) at 287-

18   306 (explaining content of each report; distinguishing inability to shut off "engine" as

19   opposed to "ignition").)[18]

20        Accordingly, the Court finds plaintiffs have not offered evidence sufficient to support

21   a finding that the ignition-lock defect results in an inability to shut off the vehicle's engine.

22

23

_____

24        [17] Accordingly, Ford's objection to said evidence is hereby sustained.

25        [18] The court also notes that although one might speculate as to how an inability to
26   shut off a vehicle's engine potentially could, in some instances, pose a safety risk, none of
     the reports suggests the customer encountered any danger, nor do plaintiffs offer any other
27   evidence in that regard.  To the extent plaintiffs cite to St. Phard v. Ira Olds Toyota Co.,
     Inc., 1997 WL 1366845, *1-2 (Mass. Super. 1997) in an effort to make such a showing,
28   plaintiffs' reliance is misplaced; the vehicle in that case had smoke "com[ing] through the
     dashboard" before the owner unsuccessfully tried to turn off the engine. See id.

1

### 3. Replacement Lock Claims

2        Plaintiffs argue Ford failed to move for summary judgment on plaintiffs "replacement"

3  lock claims and thus is not entitled to summary judgment thereon.  (See Pls.' Opp'n at 24:8-

4  11.)  As discussed above, however, because plaintiffs have offered no evidence of any

5  misrepresentation made by Ford as to the risk of failure of its ignition locks, nor offered

6  evidence sufficient to support a finding that the ignition locks posed a safety concern, Ford

7  was under no duty to disclose the risk that its ignition locks would fail after the expiration of

8  the warranty period.  See Oestriecher II, 322 Fed.Appx. at 493.  Such reasoning applies

9  equally to plaintiffs' replacement lock claims.  (See TAC ¶ 85 b. (alleging ignition-lock

10  failure after expiration of limited warranty provided with replacement locks).)

11                      ### 4. Conclusion as to CLRA

12        Because plaintiffs have failed to offer evidence sufficient to support a finding that the

13  ignition-lock defect posed or poses a risk to safety, to the extent plaintiffs' claims under the

14  CLRA are based on Ford's alleged duty to disclose the risk that its original and replacement

15  ignition locks would fail, Ford is entitled to summary judgment.[19]

16        **B. Fraudulent Concealment**

17        "The elements of an action for fraud and deceit based on concealment are (1) the

18  defendant must have concealed or suppressed a material fact, (2) the defendant must have

19  been under a duty to disclose the fact to the plaintiff, (3) the defendant must have

20  intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the

21  plaintiff must have been unaware of the fact and would not have acted as he did if he had

22  known of the concealed or suppressed fact, and (5) as a result of the concealment or

23  suppression of the fact, the plaintiff must have sustained damage."  See Hahn v. Mirda, 147

24  Cal.App.4th 740, 748 (2007).

25        Here, because Ford, as discussed above, owed plaintiffs no duty to disclose the risk

26  that its ignition locks would fail, Ford is entitled to summary judgment on plaintiffs'

27  _____

28        [19]As discussed below, to the extent plaintiffs' claims under the CLRA are based on an allegation that Ford's standard warranty is unconscionable, such claims likewise fail.

1  fraudulent concealment claim.  See Oestriecher II, 322 Fed.Appx. at 493 (holding, because

2  plaintiff had not alleged defendant made a misrepresentation or that the alleged defect

3  posed a safety risk, the "district court . . .  properly dismissed [plaintiff's] . . . fraudulent

4  concealment claim").

5      Accordingly, to the extent plaintiffs' fraudulent concealment claim is based on Ford's

6  alleged duty to disclose the risk of failure of the subject ignition locks, Ford is entitled to

7  summary judgment.[20]

8      **C. Ford's Standard Warranty**

9      Ford argues it is entitled to summary judgment because its standard three-year,

10  36,000 mile warranty is not unconscionable.  Smith contends Ford's warranty, as applied to

11  the ignition lock, is unconscionable because the warranty is presented in the form of a non-

12  negotiable contract and contains a durational limitation that Ford enforces with respect to a

13  known, latent defect. (See Pls.' Opp'n at 46:18-21.)[21]

14      "Unconscionability is ultimately a question of law for the court."  See Am. Software v.

15  Ali, 46 Cal. App. 4th 1386, 1391 (1996).  "Unconscionability has both a procedural and a

16  substantive element."  See Aron v. U-Haul Co. of California, 143 Cal.App.4th 796, 808

17  (2006).  "Both elements must be present for a court to invalidate a contract or clause[.]" Id.

18  (emphasis added).   "The procedural element of unconscionability focuses on two factors:

19  oppression and surprise."  Id. at 808.  "Oppression arises from an inequality of bargaining

20  power which results in no real negotiation and an absence of meaningful choice."  Id.

21  (internal quotation and citation omitted).  "Surprise involves the extent to which the

22  supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by

23  the party seeking to enforce the disputed terms."  Id. (internal quotation and citation

24  omitted).  "The substantive element of unconscionability focuses on the actual terms of the

25

26      [20] As discussed below, to the extent plaintiffs' fraudulent concealment claim is based

27  on an alleged duty to disclose a secret warranty program, such claim likewise fails.

28      [21] As noted above, Klein purchased her Focus vehicle "as-is" from a third party.
(See Klein Dep. 55:19-21.)

1   agreement and evaluates whether they create overly harsh or one-sided results that shock

2   the conscience."  See id. (internal quotations and citations omitted).

3          Here, Smith fails to offer evidence sufficient to support a finding that the procedural

4   element of unconscionability has been met.  In particular, Smith offers no evidence to show

5   he lacked other options for purchasing vehicles from other manufacturers or for obtaining

6   additional warranty protection from Ford.  See Dean Witter Reynolds, Inc. v. Super Ct., 211

7   Cal. App.3d 758, 768 (1989) (finding "claim of oppression may be defeated if the

8   complaining party had reasonably available alternative sources of supply from which to

9   obtain the desired goods . . . free of the terms claimed to be unconscionable").  Indeed,

10  Smith acknowledges extended warranty options were available from Ford and that he

11  chose not to purchase any such extended warranty.  (See Smith Dep. at 20:15-21:18,

12  51:14-52:18); see also Berenblat v. Apple, Inc., 2010 WL 1460297, *4-5 (N.D. Cal. 2010)

13  (holding, on motion to dismiss, plaintiffs failed to allege "oppression" where, despite non-

14  negotiability of warranty terms, plaintiffs did not allege "they lacked other options for

15  purchasing laptop computers or for obtaining additional warranty protections from

16  [defendant] itself").  Nor does Smith offer any evidence to show he was "surprised" by the

17  terms of Ford's standard warranty. To the contrary, Smith admits he was aware of the

18  durational limits at the time he purchased the warranty.  (See Smith Dep. 20:15-21:3); see

19  also Aron, 143 Cal.App.4th at 809 (finding plaintiff failed to plead claim based on

20  procedural unconscionability where only "surprise" allegedly "arose from his discovery that

21  the fuel gauge was an imprecise means of measurement" and "actual obligations imposed

22  on him by the contract were clear").

23         Smith likewise fails to offer evidence sufficient to support a finding in his favor as to

24  the substantive element of unconscionability.  Relying on Carlson v. General Motors Corp.,

25  883 F.2d 287 (4th Cir. 1989), Smith argues the durational limitation in his warranty is

26  unconscionable because Ford knew of a latent defect at the time of sale.  Carlson,

27  however, was not based on California law, and concerned claims based on an implied,

28  rather than express, warranty.  See id. at 290 .  Moreover, Carlson, was decided on a

17

1     motion to dismiss, not a motion for summary judgment, and, consequently, the Fourth

2     Circuit held, it was premature to resolve the issue of unconscionability without allowing the

3     parties to "present  evidence of the circumstances surrounding the original consummation

4     of their contractual relationship," including the existence of meaningful alternatives.  See

5     Carlson 883 F.2d at 292-93 (observing, "unconscionability generally . . . include[s] an

6     absence of meaningful choice") (internal quotation and citation omitted) (alteration in

7     original).  As discussed, plaintiffs have submitted no evidence to support a finding that

8     Smith lack a reasonable alternative, or any other evidence to support a finding of

9     procedural unconscionability.  See Aron, 143 Cal.App. 4th at 808 (holding claim of

10    unconscionability requires showing of both procedural and substantive elements).

11         Similarly, Smith's reliance on Maniscalco v. Brother Int'l Corp., 627 F.Supp. 2d 494

12    (D. N.J. 2009) and Bussian v. Daimler Chrysler Corp., 411 F.Supp. 2d 614 (M.D. N.C.

13    2006), is unavailing.  Again, both cases were decided on motions to dismiss, neither case

14    was decided under California law, and to the extent either such opinion is inconsistent

15    therewith, see, e.g., Daugherty, 144 Cal.App. 4th 830-31, has no bearing on the Court's

16    analysis herein.  Lastly, Bussian is distinguishable for the additional reason that the

17    plaintiffs therein had alleged a lack of meaningful choice due to a lack of warranty

18    competition.  See Bussian 411 F.Supp. 2d at 622.

19         Accordingly, to the extent plaintiffs' CLRA and other claims are based on the

20    asserted unconscionability of Ford's standard warranty, Ford is entitled to summary

21    judgment.

22        **D.  Secret Warranty Law**

23         Under California's Secret Warranty Law: "[a] manufacturer shall, within 90 days of

24    the adoption of an adjustment program, subject to priority for safety or emission-related

25    recalls, notify by first-class mail all owners or lessees of motor vehicles eligible under the

26    program of the condition giving rise to and the principal terms and conditions of the

27    program."  See Cal. Civ. Code § 1795.92(a).  "Adjustment program" is defined as follows:

28          "Adjustment program" means any program or policy that expands or

1
2
3
4

> extends the consumer's warranty beyond its stated limit or under which a manufacturer offers to pay for all or any part of the cost of repairing, or to reimburse consumers for all or any part of the cost of repairing, any condition that may substantially affect vehicle durability, reliability, or performance, other than service provided under a safety or emission-related recall campaign. "Adjustment program" does not include ad hoc adjustments made by a manufacturer on a case-by-case basis.

5   See Cal. Civ. Code § 1790(d).

6        Here, plaintiffs allege that Ford's After-Warranty Assistance("AWA") was an

7   "adjustment program" as defined under California's Secret Warranty Law (see TAC ¶¶ 87,

8   91, 105(a)); see also, Cal. Civ. Code § 1795.90 et seq., and, consequently, that Ford had a

9   duty to disclose such program to owners and lessees of its vehicles.  Ford moves for

10  summary judgment, arguing AWA is not an "adjustment program" as defined under the

11  Secret Warranty Law, but rather falls within the statute's exception for "ad hoc"

12  adjustments.  See Cal. Civ. Code § 1795.90(d).

13       In Morris v. BMW of North America, LLC, 2007 WL 3342612 (N.D. Cal. 2007) the

14  court found plaintiffs had adequately pleaded a violation of the Secret Warranty Law where

15  BMW was alleged to have failed to disclose its "plan to reimburse purchasers of 3 Series

16  automobiles for replacement tires."  See Morris, 2007 WL 3342612 at *2.  By contrast, in

17  Cirulli v. Hyundai Motor Co., 2009 WL 5788762 (C.D. Cal. 2009), the complaint therein was

18  found insufficient to plead an adjustment program where the plaintiff alleged the defendant

19  "reflexively denied warranty claims for [some] repairs as untimely, while quietly paying for

20  repairs for the most vocal [c]lass members on a case-by-case basis," and that defendant

21  "repaired or replaced certain customers' sub-frames free of charge due to corrosion outside

22  the warranty period, purportedly as a gesture of 'goodwill.'"  See Cirulli, 2009 WL 5788762

23  at *6 (emphasis in original omitted) (further holding "paying for repairs for the most vocal

24  [c]lass members" while "reflexively" denying claims for others is not, without more, a

25  violation of the Secret Warranty Law).

26       Here, plaintiffs argue that an "ad hoc" or "case-by-case" adjustments must be

27  "standardless" and that the questions contained in Ford's materials describing the AWA

28  constitute "eligibility requirements"; thus, plaintiffs conclude, the AWA  provides for "more

19

1    than ad hoc judgments." (<u>See</u> Pls.' Opp'n at 50:6-9; <u>see also</u> Bradley Decl. Ex. 3 (Warranty

2    & Policy Manual) at 6 (suggesting questions for dealers to consider before offering "after-

3    warranty assistance").) Plaintiffs further point to Ford's replacement thereunder of a large

4    number of locks as further support for their argument that AWA adjustments are not "ad

5    hoc" or "case-by-case." (<u>See</u> Pls.' Opp'n at 50:9-10 (noting Ford replaced more than

6    16,000 Focus ignition locks in its 2000-2006 model years Focus vehicles). The Court finds

7    plaintiffs' arguments unpersuasive.

8        First, as Ford points out, the documents on which plaintiffs rely show AWA applies

9    generally to all customers who incur after-warranty repair costs, and that the adjustments

10   are not specific to customers with ignition-lock problems. In <u>Morris</u>, by contrast, BMW had

11   adopted a plan specifically to reimburse "purchasers of 3 Series automobiles for

12   replacement tires." <u>See Morris</u>, 2007 WL 3342612 at *2.) Ford's AWA thus is

13   distinguishable from the program addressed in <u>Morris</u> and, instead, is analogous to the

14   adjustments before the court in <u>Cirulli</u>, in that it expressly requires dealers to make

15   decisions on a "case-by-case" basis, upon consideration of the circumstances pertaining at

16   the time the customer makes a complaint. <u>See Cirulli</u>, 2009 WL 5788762 at *6; Bradley

17   Decl. Ex. 3 at 6 (providing "[AWA] is a payment made on a case-by-case basis . . . . AWA

18   <u>may</u> be offered when a [Ford] vehicle is not performing to customer expectation and there

19   is an opportunity for increased customer satisfaction and owner loyalty"; further providing

20   "AWA decisions should be made on a case-by-case basis considering all factors, including

21   past loyalty and the likelihood of favorably influencing the customer's satisfaction and future

22   sales and service intentions") (emphasis added).

23       Moreover, plaintiff's contention that an "ad hoc" decision must be "standardless" is

24   unsupported by any citation to case or statutory authority. As defined by Black's Law

25   dictionary, "ad hoc" means "[f]ormed for a particular purpose." <u>See</u> Blacks Law Dictionary

26   46 (9th ed. 2009). Nothing in Ford's AWA materials is inconsistent with this definition.

27   (<u>See</u> Bradley Decl. Ex. 3 at 6-7 (suggesting matters for consideration that may "help" with

28   determination as to whether customer "may or may not deserve an AWA," such as:

1  (1) "Has this person been a long-time customer?"; (2) "Has the vehicle been properly

2  maintained?"; (3) "Does the customer like his/her vehicle aside from the present concern?";

3  (4) "Was this an especially upset customer?"; (5) "Do you believe AWA would favorably

4  influence this customer's future new car purchase decision?").)

5      Accordingly, because plaintiffs have failed to offer evidence sufficient to support a

6  finding that Ford's AWA is an "adjustment program," to the extent plaintiffs' claims are

7  based on an alleged violation of the Secret Warranty Law, Ford is entitled to summary

8  judgment.

9      **E.  UCL**

10     Plaintiffs allege Ford violated California's Unfair Competition Law by engaging in the

11 conduct on which plaintiffs' other causes of action are based. The UCL prohibits business

12 acts or practices that are (1) fraudulent, (2) unfair, or (3) unlawful.  See Cal. Bus. & Prof.

13 Code § 17200; see also Daugherty, 144 Cal.App.4th at 837-839 (describing "three prongs"

14 of UCL).

15     **1.  Fraudulent Conduct**

16     In order to state a claim under the UCL for fraudulent business practices, a plaintiff

17 must show that "members of the public are likely to be deceived" by the practices alleged.

18 See Bardin, 136 Cal.App.4th at 1261.  As applicable to plaintiffs' UCL claims in the instant

19 action, the Court finds the reasoning of the California Court of Appeal in Daugherty to be

20 persuasive and dispositive :

21         We cannot agree that a failure to disclose a fact one has no affirmative
           duty to disclose is likely to deceive anyone within the meaning of the UCL
22         . . . . [I]n order to be deceived, members of the public must have had an
           expectation or an assumption about the matter in question . . . . The only
23         expectation buyers could have had about the [defective] engine was that it
           would function properly for the length of Honda's express warranty, and it
24         did.  Honda did nothing that was likely to deceive the general public by
           failing to disclose that [the] engine might, in the fullness of time, eventually
25         dislodge the front balancer shaft oil seal and cause an oil leak.

26 See Daugherty, 144 Cal.App.4th at 838.

27     Here, as discussed above, plaintiffs have failed to show an affirmative duty to

28 disclose the risk of post-warranty failure of the ignition locks; consequently, plaintiffs have

21

1   not shown that a reasonable customer could have been deceived, because, as a matter of

2   law, the only expectation customers could have had about the subject ignition locks was

3   that they would function for the length of Ford's express warranty.  Further, as discussed

4   above, plaintiffs have not shown Ford was required to publicize its AWA.

5               **2.  Unfair Conduct**

6        Similarly, to the extent plaintiffs' UCL claim is brought under the "unfair prong," such

7   claim is unavailing because, as stated in Daugherty, "the failure to disclose a defect that

8   might, or might not, shorten the effective life span of an automobile part that functions

9   precisely as warranted throughout the term of its express warranty cannot be characterized

10  as causing a substantial injury to consumers, and accordingly does not constitute an unfair

11  practice under the UCL."  See id. at 839.  Likewise, plaintiff's failure to show Ford's AWA

12  constituted a secret warranty precludes plaintiffs' claim that any lack of publication thereof

13  constituted an unfair business practice under the UCL.

14              **3.  Unlawful Conduct**

15       Lastly, as brought under the "unlawful prong" of the UCL, plaintiffs' claim is

16  derivative of plaintiffs' CLRA , fraudulent concealment, and Secret Warranty Law claims,

17  and, consequently, fails as well.

18             **4.  Conclusion as to UCL Claims**

19       Accordingly, Ford is entitled to summary judgment on plaintiffs' UCL claims.

20      **F.  Unjust Enrichment**

21       Plaintiffs bring a separate cause of action titled Unjust Enrichment.  Unjust

22  enrichment, however, "is not a separate cause of action," but, rather, must rely on some

23  other claim that is cognizable.  See Jogani v. Superior Court, 165 Cal.App.4th 901, 911

24  (2008) ("[U]njust enrichment is not a cause of action[;] [r]ather it is a general principle

25  underlying various doctrines and remedies [.]"); see also IB Melchior v. New Line Prods.,

26  Inc. 106 Cal.App.4th 779, 793 (2003) ("[T]here is no cause of action in California for unjust

27  enrichment[;] [t]he phrase 'Unjust Enrichment' does not describe a theory of recovery, but

28  an effect: the result of a failure to make restitution under circumstances where it is

1    equitable to do so.") (internal quotation and citation omitted).  As described above, Ford is

2    entitled to summary judgment on each of plaintiffs' other claims.

3        Accordingly, Ford is entitled to summary judgment on plaintiffs' claim for unjust

4    enrichment.[22]

5                              **CONCLUSION**

6        For the reasons stated above:

7        1.  Ford's Motion for Summary Judgment as to plaintiff Richard Smith is hereby

8    GRANTED.

9        2.  Ford's Motion for Summary Judgment as to plaintiff Rebecca Klein is hereby

10   GRANTED.

11       **IT IS SO ORDERED.**

12   Dated: September 13, 2010

                                    *Maxine M. Chesney*
                                    _____
13                                  MAXINE M. CHESNEY
                                    United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27   _____

28       [22]In light of the above rulings, the Court does not address herein Ford's additional
     arguments in support of summary judgment.

                                    23